

**SO ORDERED.**

**SIGNED this 07 day of September, 2011.**

_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

IN RE:                                          )
                                                )
TIMOTHY KEVIN WEDDINGTON,                       )       Case No. 09-13588
                                                )       Chapter 7
            Debtor.                             )
_____)
                                                )
CARL B. DAVIS, Trustee                          )
                                                )
            Plaintiff,                          )
                                                )
v.                                              )       Adversary No. 10-5236
                                                )
TIMOTHY KEVIN WEDDINGTON,                       )
                                                )
            Defendant.                          )
_____)

## MEMORANDUM OPINION

The Chapter 7 Trustee, Carl B. Davis (Trustee), generally objects to Timothy Weddington's

discharge and seeks to expand his chapter 7 estate to include all of the property Weddington obtained

Case 10-05236    Doc# 41    Filed 09/07/11    Page 1 of 30

from the time he filed this case as a chapter 13 in October of 2009 to the date of its conversion to chapter 7.[1]  In addition, the Trustee objects to Weddington's exemption of his hunting equipment as a tool of the trade because guiding hunts is only one of three trades the debtor pursues.  The fundamental issue in this case is whether Weddington should receive a chapter 7 discharge despite his failure to disclose his employment to his trustees.  There are other issues, but the main factual and legal questions revolve around Weddington's post-petition conduct and particularly his candor with the trustees and this tribunal.  The facts that control the discharge objection and estate expansion motion may be best expressed in temporal order.  A brief discussion of Weddington's occupations and banking practices will follow.

All of these matters were tried on June 15, 2011.[2]  After hearing Weddington's testimony and reviewing the documents introduced as evidence, the Court is prepared to rule.[3]

Jurisdiction

Each of the Trustee's claims arises under Title 11 or in a case under Title 11 and are core proceedings.[4]  The Court has the power to hear and enter a final judgment.[5]

Facts

---

[1]  *See* 11 U.S.C. § § 727(a)(2)(A), 727(a)(2)(B), 727(a)(3), 727(a)(4)(A) and (D), and 348(f)(2).  Further statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., unless otherwise specified.

[2]  In addition to the trial record, the parties submitted a number of stipulations in the Final Pretrial Order. *See* Adv. Dkt. 33, § 6.

[3]  The chapter 7 Trustee Carl Davis appeared personally.  William H. Zimmerman appeared for the defendant Timothy Weddington.

[4]  28 U.S.C. § 157(b)(2)(B), (J), and (O).

[5]  28 U.S.C. § 1334(b) and § 157(b)(1).

-2-

*The Bankruptcy Filings*

Before March of 2009, Timothy Weddington operated two businesses, Water Designs, L.L.C. and 7 Fingers Outfitters.[6]  Water Designs created and installed water features at residences.  The outfitting business mainly consisted of Weddington guiding deer hunts in Western Kansas.  By early 2009, the housing crash had taken its toll on the water business and, in March, Weddington filed his first chapter 13 in this District.[7]  Without a plan being confirmed, that case was dismissed on July 23, 2009 because Weddington failed to provide a creditor with a copy of his 2008 tax return.[8]  Weddington subsequently received a refund of undistributed payments from the March case in the amount of $3,459.[9]  In the four months the March case was on file, Weddington paid the trustee $5,000, a little more than one plan payment.[10]

After the March case was dismissed, Weddington got a job at Spurrier Chemical Co.  He began work September 14 and received his first paycheck on September 30, 2009.  On October 29, 2009, he filed a second chapter 13 case in this District.  Represented by William H. Zimmerman, the same lawyer who filed the March case, Weddington again filed an ambitious plan, promising to

---

[6]  At some point in 2009, "7 Fingers Outfitters" came to be known as "10-Gauge Outfitters."

[7]  Case no. 09-10510 was not Weddington's first bankruptcy case.  The docket in that case reflects that Weddington had filed two prior chapter 7 cases in Tennessee, one in 1990 and another in 1998.  In 19 years, he has filed four petitions counting this one.

[8]  *See* § 521(e)(2)(C).

[9]  In addition, Weddington had received an inheritance of some $80,000 while living in Tennessee prior to the filing of his March case that he had exhausted by the time he re-filed in October. *See* Ex. 11.

[10]  The March plan proposed sixty $4,500 monthly payments.

-3-

repay his creditors by making sixty $2,800 monthly payments. But by the time of the December 16, 2009 first meeting of creditors in the October case, he still had not made even one plan payment. Only at the trustee's urging did Weddington commence payments to her and, from December of 2009 to May of 2010, he paid in $11,200, the equivalent of only four plan payments.

In the schedules, statement of financial affairs, and Official Form 22C filed in the October case, Weddington omitted any mention of his new employment at Spurrier. He filed a Pay Advice Declaration that recited, under oath, that he had "not been employed" in the six months before filing. On Schedule I, Weddington merely reported that he was a self-employed hunting guide operating under the name "10-Guage [sic] Outfitters." Weddington says that he did not read his petition and supporting papers carefully when he signed them at Zimmerman's office and that Zimmerman was not present. Zimmerman did not testify, but stated on the record at trial and in Weddington's deposition that the omission of the new job was attorney error for which he would "fall on his sword." Zimmerman did not amend any of the papers to remedy the omission.

From October 29 until December 16, 2009, the debtor enjoyed chapter 13's protections, but made no plan payments.[11] On December 16, he appeared for his first meeting of creditors with chapter 13 Trustee Williams.[12] When Ms. Williams asked him if his "employment had changed," Weddington said "No, ma'am." This statement is only semi-accurate: Weddington had the same job on December 16, 2009 that he had at filing, but he never told the trustee about that job. And, he had another chance to do that when she asked whether "all the information in your petition,

---

[11] Weddington sought and obtained on an expedited basis an extension of the automatic stay under § 362(c)(3), but did not submit an order on his motion until July 23, 2010, 8 months later. Case No. 09-13588, Dkt. nos. 13, 38, 78.

[12] A transcript of this meeting is in evidence at Ex. 10.

-4-

schedules, and statement of financial affairs [is] true or correct," but he didn't. Instead, he told her that he had reviewed his papers and they were correct. In fact, none of these statements was true.

Weddington had made no plan payments in the two months running up to this meeting and hedged when the trustee demanded they be made. Even when she expressed her considerable doubt about his prospects for confirming the plan as filed because of its lack of feasibility, Weddington said nothing about his "new" job. When his chapter 13 case first came up for hearing on January 13, 2010, Weddington was still in payment default (and had been for three months). He was ordered to cure that default by January 31 or the case would be dismissed. The hearing on confirmation was continued to March 10, 2010. On that date the confirmation hearing was set over to a one hour evidentiary hearing on May 25, 2010.

By the early winter of 2010, Weddington had developed a new interest. According to his bank records, beginning in February of 2010, the debtor became a frequent online visitor to Anastasia International via a website where one can "communicate" with "thousands of beautiful ladies from Russia and the Ukraine." Weddington used these services extensively from February 16, 2010 until at least June 2, 2010. On many days he incurred multiple debits in excess of hundreds of dollars and, over the entire period, he spent $11,464.26 from one of his bank accounts.[13]

Apparently the siren song of Ukraine was irresistible. On March 30, 2010, Weddington obtained a passport so that he could visit in person. Fortuitously, Weddington began to receive additional funds to augment his still-undisclosed salary at Spurrier around this time. In early April

---

[13] A detailed listing of each of Weddington's account debits for Anastasia International pulled from the bank statements on Account no. ****9606 is attached as Appendix A. All of the information in the Appendices was gleaned from an in camera examination of the bank records that were admitted in evidence. Virtually none of this information was presented by the Trustee at trial. *See* Ex. 2.

of 2010, the chapter 13 trustee filed her final report in the dismissed March case and paid Weddington a refund of $3,459. On April 22 and 23, Weddington received his 2009 Kansas income tax refund via direct deposit of $1,892. On April 30, he received his federal refund of $7,330.

On May 3, 2010, after receiving over $12,000 of refunds in addition to his Spurrier pay, Weddington filed a motion to convert his case to chapter 7. Trustee Davis was appointed Weddington's chapter 7 trustee. As will be discussed below, none of these funds were nominally property of his chapter 7 estate.[14] Ten days after converting, he departed for Ukraine on a two-week trip, traveling to Kiev, Odessa, and Kharkiv. The plane ticket alone cost $1,400. In a subsequent Rule 2004 examination, he told Trustee Davis that the trip was a vacation, not for business purposes.[15] Contrast this evidence with Weddington's trial testimony that he went to the Ukraine with a friend to locate "interpreters" to work on a dating website he hoped to establish in the United States. His bank records reflect numerous purchases from Anastasia International, restaurants, and ATM withdrawals while in Ukraine totaling at least $2,636.[16] Even after Weddington returned home in late May, he continued to patronize the website until June 2, 2010, the date of his last Anastasia transaction.[17]

Weddington received his last cash windfall on June 10, 2010 when chapter 13 Trustee

---

[14] *See* § 348(a) and (f)(1).

[15] Ex. 4, p. 72, lines 4-21.

[16] *See* Ex. 2. These expenditures do not include any credit card charges that Weddington may have incurred while in Ukraine.

[17] It is unknown if Weddington engaged in further Anatasia transactions beyond June 2. The last bank statement placed in evidence is dated August 10, 2010.

-6-

Williams refunded him $3,389 in undistributed funds from the October chapter 13 case.[18] He swiftly and efficiently disposed of all this money and his Spurrier pay, spending $12,248 from his checking account in May and $11,001 more in June. In other words, after his conversion to chapter 7, but while still in bankruptcy, debtor Weddington spent both refunds from his chapter 13 cases and both his tax refunds, an amount exceeding $15,000, on vacations, dining out, and internet dating.

Then, on August 17, 2010 Trustee Davis convened Weddington's chapter 7 first meeting of creditors. Again, the well-kept secret of Weddington's Spurrier employment never came up. Instead, when Zimmerman asked Weddington if the "debts and assets listed in your 13" were the same, Weddington replied that they were. The Trustee and Weddington discussed at length his work as a guide and a designer of water features, but no one alluded to his job. In response to Trustee Davis's questions to the debtor, Zimmerman stated that Weddington "truly had two trades" and Weddington added that he was still engaged in what Davis described as a contracting business, Water Designs. Indeed, Weddington was wearing his Water Designs logo shirt at the meeting. He gave detailed testimony concerning the tools, trailer, and truck that he used in the water business. When the conversation moved to obtaining a list of Weddington's guns, he stated that he used those in his other "trade," being an outfitter or hunting guide. He described the other tools of that trade, including his fiberglass hunting stands that are placed on various rented land for his guided hunts. At the end of the meeting, Trustee Davis examined Weddington closely about whether he worked more in the hunting business or the water business. In response, Zimmerman advised the Trustee that from an "income standpoint," the debtor's hunting was "probably your principal occupation,

---

[18] Like the refund in the March case and the tax refunds, these funds were nominally not property of Weddington's chapter 7 estate.

-7-

certainly on a cash flow basis."[19]   Ten months after filing the October case, Weddington still dissembled about his work at Spurrier.[20]

By September 23, 2010, the date of the Rule 2004 examination, Trustee Davis had learned of Weddington's well-concealed employment which, as he has pled his complaint in this proceeding, is the principal basis for barring the debtor's discharge.  Weddington brought his 2009 tax returns to the examination and Davis established that he had begun to work for Spurrier on September 15, 2009.[21]   As part of his inquiry, Davis pursued details about the debtor's hunting business and his bank accounts.   He also asked specific questions about the omission of the Spurrier income. Weddington admitted that he had been working for Spurrier throughout the October case and that he never told the chapter 13 trustee that.  He said he discussed the job with Zimmerman and, as at trial, Zimmerman interjected that his office "screwed that up, as far as I could tell." [22]

---

[19]   This unsworn "testimony" by Mr. Zimmerman on these critical points pervades not only this § 341 transcript, but also the chapter 13 § 341 transcript and the debtor's Rule 2004 examination taken by Trustee Davis.  Time and again, Zimmerman, *not* the debtor, answered the hard questions and the Trustee did not press the issue.

[20]   What is particularly puzzling about this is that Trustee Davis knew about and referred to the tax refunds during the August § 341 meeting.  If he had Weddington's tax return he would undoubtedly have noticed the entry for wages on line 7.  Ex. 5.  The presence of wages is a strong hint that the debtor had a job.  He did not specifically ask about the tax return at the first meeting, suggesting he either already had it or that he was content with Weddington's admission that he'd spent all of the 2009 refund beforehand.  In any event, there is no record when the Trustee obtained the return.  Davis' letter request for documents from Weddington was first sent in early June 2010 but it appears that he did not have all the requested documents at the time of the § 341 meeting in August. Ex. 7.  Had Trustee Davis timely received the requested bank records, he would have also discovered the Spurrier job, as the Spurrier payroll deposit was clearly shown on every bank statement after September 15, 2009.

[21]   Davis stated in the examination that he had received the 2009 returns from Zimmerman, apparently in response to an informal written request.  See Ex. 4, lines 7-14.

[22]   Ex. 4, p. 40-42.

-8-

Weddington testified at trial that he was motivated to remain in chapter 13 to retain his home where he lives with his children. While he described this as his "number one priority" at trial, it does not appear that he made more than one payment in the March chapter 13 case and he made only four chapter 13 payments in the October case, nor does it appear that he made any house payments to Chase, his mortgage-holder, outside the plan.[23] In the March case, he proposed to cure an $8,500 mortgage default. By the time he filed his plan in the October case, the arrearage had grown to $20,000, suggesting that no house payments were made in the first case. Weddington's expenditure on virtual (and on-site) Ukrainian companionship while his mortgage was seriously in arrears belies the idea that housing was his "number one priority" in the Winter of 2010.

*The Debtor's Businesses and Occupations*

The Trustee also objected to Weddington's attempt to exempt as tools of the trade his hunting and guiding equipment which largely consists of fiberglass hunting stands that he places on rented land in Western Kansas. A review of his banking and business practices is necessary to determine Weddington's principal trade or business. When he filed the October case, Weddington was working in the water design business and guiding hunts, but he was spending most of his time at Spurrier. He says that both enterprises continued while he was in chapter 13 and after his conversion to chapter 7.

Weddington maintained two accounts at Rose Hill Bank.[24] He used account no. ****9606 in his personal name from August 2008 to August 2010. Most of his banking activity occurred in this

---

[23] The plans in both cases provided for payment of the debtor's mortgage loan inside the plan in keeping with this bankruptcy district's standing order, S.O. 09-2, eff. October 1, 2008.

[24] *See* Ex. 2 and Ex. 3

-9-

account. He maintained a second account no.****8206 called "Tim K. Weddington dba 7 Fingers Outfitters" and used that account from January 2008 until November 2009. In early November of 2009, Weddington drew the balance of this account to zero. After that time, he used the 9606 account for both his personal and business activities, co-mingling those funds without regard to their source. The bank records introduced at trial show transfers into them from a third account, ****1806 which was the Water Designs account, but no testimony was offered at trial concerning this account. Only the bank statements for the two other accounts were offered in evidence and no check copies were included, making it impossible to determine to whom checks were written. Weddington frequently used his debit card, though, and the transferees of all of the debit transactions are named in the statements.

The parties stipulated that the former 7 Fingers account, Account no. ****7206, was not used in the six months prior to the bankruptcy filing. On October 30, 2009, the day after the petition was filed, Weddington deposited $7,500 received from business clients for hunting. On November 6, 2009, he wrote a check to an unknown payee for the entire balance of the account – $7,581.36.[25] The parties also stipulated that "[m]any of the debtors [sic] business transactions are done on a cash basis."

As noted above, the debtor has been employed at Spurrier Chemical Company in an unknown capacity since September 15, 2009. He earns gross bi-weekly income there of $2,265. Annualized, his gross pay at Spurrier would be $68,250. For the partial year 2009, he earned wages of $16,825. In addition to his job, Weddington operated his guiding business. His Statement of Financial Affairs

---

[25] *See* Adv. Dkt. 33, ¶ 6.13. Until the $7,500 deposit, the bank statements continuously reflect an account balance of $81.36 from March to October, 2009. *See* Ex. 3.

reported gross income of $55,300 from Spurrier, the hunting business, and Water Designs during 2009 up to the date of filing.[26]  Weddington speculated that the $38,475 not earned from Spurrier was split between hunting and Water Designs.[27]  Weddington says that he guides hunts four weeks every year and charges hunters $4,500 per deer tag for guiding services.  At trial, he testified that he guided 16 hunters per deer season but he testified in his Rule 2004 examination that the number of hunters was 8-12.[28]  There is no evidence concerning how much Weddington has made in other years in either of these pursuits.

<u>Analysis</u>

*General Objections to Discharge, 11 U.S.C. § 727(a)*

Denying a chapter 7 debtor his discharge is an extraordinary remedy that is only available where the objecting party supports its claims with evidence that meets the elements of a strictly-construed statute.  Here, the Trustee objects to Weddington's discharge on three separate grounds under § 727(a).  First, the Trustee accuses the debtor of concealing an asset of his own with the intent to hinder, delay or defraud his creditors and of concealing  property of the estate after he filed his case.[29]  Second, the Trustee alleges that the debtor failed to keep records from which the debtor's financial condition might be ascertained.[30] Finally, the Trustee claims that the debtor knowingly and fraudulently made a false oath on the several occasions that he swore that his schedules were true

---

[26]  Ex. 4, p.62.

[27]  $55,300-$16,825=$38,745.  *See* Ex. 4, p.63.

[28]  Ex. 4, pp. 55-56.

[29]  *See* §§  727(a)(2)(A) and 727(a)(2)(B).

[30]  *See* § 727(a)(3).

-11-

Case 10-05236   Doc# 41   Filed 09/07/11   Page 11 of 30

and correct, he was not employed and lacked pay stubs, and that he withheld from the Trustee recorded information pertaining to his financial affairs.[31]

*False Oath, § 727(a)(4)(A)*

About a month before trial, the Trustee filed a motion for partial summary judgment on his false oath claim.[32] In his response, the debtor neither controverted the Trustee's statement of uncontroverted facts, nor presented any additional statements of fact supported with references to an affidavit or other portions of the record, but argued that debtor's fraudulent intent could not be inferred from those facts and that summary judgment on the false oath claim was inappropriate.[33] At trial the summary judgment motion was taken under advisement together with the evidentiary record presented at trial.

Looking first to the motion, even though the Trustee's facts are uncontroverted, he must still show that those facts entitle him to judgment as a matter of law on his § 727(a)(4) claim.[34] If different ultimate inferences may be drawn from the facts, summary judgment is not appropriate.[35] The undisputed facts presented by the Trustee establish that Weddington was employed on the dates of his petition and conversion to chapter 7, that he did not disclose his employment with Spurrier,

---

[31] *See* §§ 727(a)(4)(A) and 727(a)(4)(D).

[32] Adv. Dkt. 29 and 30. The timing of the Trustee's motion was such that briefing on the motion was not complete when the case came on for trial.

[33] Because Weddington did not specifically controvert any of the Trustee's 15 statements of uncontroverted fact with citation to record support, those facts are deemed admitted. *See* D. Kan. LBR 7056.1(a), (b)(2) and (d).

[34] *E.E.O.C. v. Lady Baltimore Foods, Inc.,* 643 F. Supp. 406, 407 (D. Kan. 1986).

[35] *Sec. Nat. Bank v. Belleville Livestock Comm'n Co.,* 619 F.2d 840, 847 (10th Cir. 1979).

and that he falsely swore to the accuracy of his bankruptcy schedules and pay advice declaration. The key issue, rarely one to be determined on summary judgment, is whether Weddington had the requisite fraudulent intent when he omitted his employment and falsely swore to his bankruptcy schedules and forms. Weddington's fraudulent intent cannot be inferred from the Trustee's uncontroverted facts requiring that the motion be denied. We turn to the merits.

To successfully deny Weddington's discharge on grounds of a false oath the Trustee must show that (1) debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently.[36] On no less than seven occasions, Weddington made a false oath concerning his Spurrier employment and/or income: (1) in his Statement of Financial Affairs (SOFA) filed October 29, 2009, debtor did not show his salary or income from his job at Spurrier; (2) on Schedule I filed October 29, 2009, debtor did not list any salary or wages from employment but only showed business income; nor did he identify his occupation or employer; (3) on Official Form 22C filed October 29, 2009, a chapter 13 debtor's Statement of Current Monthly Income, debtor did not list any salary or wage income and only listed business income; (4) on Official Form 6 filed October 29, 2009, debtor's Declaration Concerning Debtor's Schedules, Weddington declared under penalty of perjury that his schedules were true and correct; (5) on Debtor's Declaration Regarding Payment Advices filed October 29, 2009, Weddington declared under penalty of perjury that he had not been employed by any employer

---

[36] *Stamat v. Neary,* 635 F.3d 974, 978 (7th Cir. 2011); *In re Retz,* 606 F.3d 1189, 1197 (9th Cir. 2010).

-13-

during the 60-day period prior to the filing of his chapter 13 petition;[37] (6) at his § 341 meeting before the chapter 13 trustee on December 16, 2009, Weddington testified under oath that all the information on his petition, schedules and statement of financial affairs was true and correct;[38] (7) after conversion to chapter 7, at his chapter 7 § 341 meeting before the Trustee on August 17, 2010, Weddington testified under oath, reaffirming that his debts and assets previously listed in his chapter 13 were correct as listed. From every appearance, Weddington was a self-employed individual debtor with only business income. His counsel represented that Weddington "truly has two trades," and debtor went on to describe his contracting business (Water Designs) and his hunting business with the Trustee. Debtor never corrected his counsel's erroneous representation or advised the Trustee of his Spurrier employment.[39]

Each of the foregoing constitute statements under oath for purposes of denial of a chapter 7 discharge on the ground that debtor made a false oath in his bankruptcy case.[40] The omission of debtor's Spurrier job and attendant income is material. A fact is material if it bears a relationship to the debtor's business transactions or estate, concerns the discovery of assets or the existence and

---

[37] This Declaration was executed on October 12, 2009, also at a time when Weddington was employed by Spurrier.

[38] Ex. 10.

[39] Ex. 11.

[40] *In re Butler,* 377 B.R. 895, 922 (Bankr. D. Utah 2006) (Debtor's petition, schedules, statement of financial affairs, statements made at creditors meeting, and testimony given at a Rule 2004 examination all constitute statements under oath.); *In re Garland,* 417 B.R. 805, 814 (10th Cir. BAP 2009) (False oath may be either a false statement or omission in debtor's schedules or a false statement by debtor at examination during the course of proceedings.); *Retz, supra* at 1196 (An omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath.).

-14-

disposition of the debtor's property, or detrimentally affects administration of the estate.[41] Weddington acted knowingly. A debtor acts knowingly if he or she acts deliberately and consciously.[42] Weddington credibly testified that he knew he was employed by Spurrier on the petition date and that he advised his lawyer of that fact prior to signing and filing the petition.

The only element truly in issue on the Trustee's false oath claim is whether Weddington acted fraudulently. This determination rests largely on the circumstances of the case and an assessment of the credibility and demeanor of the debtor.[43] A showing of debtor's reckless disregard for the truth is sufficient to prove fraudulent intent.[44] Courts have identified a set of indicia suggestive of fraudulent intent that includes concealment, conversion of assets, and a pattern of sharp dealings.[45] And fraud may sometimes be inferred from a deterioration of the debtor's financial condition after a questioned transaction.[46]

The debtor relies on the defense of inadvertence, arguing that he did not harbor the fraudulent intent necessary to support this claim. An inadvertent omission is not fraudulent. Nor is fraudulent

---

[41] *Stamat,* supra at 982; Retz, *supra* at 1198*; Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir. 1990)*; Garland, supra* at 814.

[42] *Retz, supra* at 1198.

[43] *Stamat,* supra at 982; *Retz, supra* at 1199; *Calder, supra* at 956; *Garland, supra* at 815.

[44] *Stamat, supra* at 982; *Garland, supra* at 815 (reckless indifference to the truth is functional equivalent of fraud for purposes of § 727(a)(4)(A)); *Miller,* 448 B.R. 551 (Bankr. N.D. Okla. 2011); *Retz, supra* (reckless indifference to truth where debtor signed bankruptcy schedules and SOFA in blank or without reading them).

[45] *Garland, supra* at 815.

[46] *Id.*

-15-

intent shown if the debtor comes forward with the omitted material *of his own accord*.[47]  No one explained at trial why the appropriate documents were not promptly amended once the omission was finally discovered.  In fact, debtor had still not amended his bankruptcy papers at the time of trial, nearly two years later.[48]

   At best, Weddington acted with reckless disregard for the truth, and therefore, with fraudulent intent in omitting his Spurrier employment and income, falsely swearing to the accuracy of his bankruptcy papers, and falsely testifying about it.  This reckless indifference is shown by several pieces of evidence.  First, Weddington testified at trial that he did not read or review closely his bankruptcy papers prior to signing and filing them and that his attorney was not present when he signed them.  While this may have some superficial appeal as to certain schedules that may have been presented together, had more content to read and be less understandable to a lay person, one of the documents he filed and signed separately under penalty of perjury was the Pay Advice Declaration.  It is a single page document containing concise representations regarding a debtor's employment status and payment advices.  On this document, we have Weddington's scanned signature, executed on October 12, 2009, and a handwritten check mark of the appropriate box.[49]  It plainly states and represents that he has "not been employed by any employer within the 60 days before the date of the filing . . ."  This form could not be any clearer.  Weddington cannot lay this

---

   [47]  *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294-95 (10th Cir. 1997);

   [48]  *Retz, supra* at 1199 (Failure to amend schedules and SOFA in the three years between the petition and trial can constitute reckless indifference to the truth.).

   [49]  Case No. 09-13588, Dkt. 2.  Upon closer examination of the declaration, the ink color of the check mark and Weddington's signature appear to be of a different color.  This lends some speculation that Weddington may have signed the declaration in blank and that someone else marked or checked the "no employer" box.  But no testimony supported such a supposition.

-16-

false oath at the feet of his lawyer.

Weddington's purported failure to closely scrutinize his bankruptcy papers and schedules before signing them is no defense.[50] This is precisely the "reckless disregard for the truth" that § 727(a)(4)(A) proscribes. In *Retz,* the court rejected debtor's argument that he was unaware of the errors and omissions in his bankruptcy schedules and statement of financial affairs because he signed the forms in blank and relied upon his attorney to fill in the correct information:

> Retz's argument highlights the reason that the debtor is required to attest that he has read the Schedules and SOFA: to ensure to the greatest extent possible that the information turned over to the bankruptcy court is accurate. *See In re Searles,* 317 B.R. at 378 ("The continuing nature of the duty to assure accurate schedules of assets is fundamental because the viability of the system of voluntary bankruptcy depends upon full, candid, and complete disclosure by debtors of their financial affiars.").
>
> . . . The court properly noted that the significant number of falsehoods and omissions, together with the failure to amend the in the three years between the petition and trial can constitute reckless indifference to the truth, which is evidence of fraudulent intent. [citations omitted]. The fact that Retz signed the forms in blank reflects this same reckless indifference to the truth, which adds to the circumstantial evidence of fraudulent intent.[51]

The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations.[52] Full and accurate disclosure of one's income is required of the debtor.[53] The privilege of a "fresh start" that comes with filing for

---

[50] At his § 341 meeting in December of 2009, Weddington testified that he had reviewed all the information in his petition, schedules, and statement of financial affairs before he signed the documents. Ex. 10, p. 2.

[51] *Retz, supra* at 1199.

[52] *Retz, supra* at 1196.

[53] 11 U.S.C. § 521(a)(1)(B).

-17-

bankruptcy is reserved for the honest but unfortunate debtor.[54]  As noted by the court in *Stamat,* "[t]he operation of the bankruptcy system depends on honest reporting.  If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive."[55]  Likewise, our own Tenth Circuit Bankruptcy Appellate Panel has emphasized full disclosure:

> We cannot overemphasize the importance to the bankruptcy system of full and honest disclosure of information by the parties seeking its protections.  A Chapter 7 proceeding is not, nor should be, an arena in which players engage in obfuscation of facts in order to obtain an outcome not sanctioned by the Bankruptcy Code. . . . Typically, the protections provided by Chapter 7 are sought by "honest but unfortunate debtors" who do their best to fully disclose their financial condition.  Occasionally, however, a debtor comes before the bankruptcy courts seeking something other than a "fresh start," such as elimination of creditor claims without the corresponding full disclosure of assets.[56]

Nor is Weddington's intent negated by his lawyer's confessed omission of the Spurrier income from debtor's schedules.  A debtor who acts in reliance on his attorney may lack the requisite intent.  But the debtor's reliance must be in good faith and "when the erroneous information should [be] evident to the debtor," the advice of counsel is not a defense.[57]  The *Retz* court reasoned:

> A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath.[58]

Finally, Weddington might be cut some slack if he were new to the bankruptcy game.  He

---

[54] *Stamat v. Neary (In re Stamat),* 635 F.3d 974, 978 (7th Cir. 2011).

[55] *Id.* at 982, quoting *Payne v. Wood,* 775 F.2d 202, 205 (7th Cir. 1985).

[56] *Garland, supra* at 815-16.

[57] *Retz, supra* at 1199.

[58] *Id.,* quoting *Boroff v. Tully (In re Tully),* 818 F.2d 106,111 (1st Cir. 1987).

-18-

is not.  Specifically, having just exited the March chapter 13 case, Weddington had reason to know what was expected of him as a debtor in a chapter 13 case.  He knew that he had to have a regular source of income to fund the chapter 13 plan and make plan payments.  He knew that when he refiled a chapter 13 petition in October.  What had changed between the dismissal of his first chapter 13 case in July and refiling in October?  Weddington purportedly liquidated most of the business assets of Water Designs to pay down bank debt and had gained new employment with a stable source of regular income.  He reduced his proposed plan payments by nearly 40 percent in his second chapter 13 plan.[59]  That he would not come forward with such information of his own volition to convince the chapter 13 trustee that his plan was confirmable and that he could complete his proposed plan is simply inexplicable.  Even more damning is Weddington's failure to divulge the new-found employment when specifically pressed by Trustee Williams in the chapter 13 first meeting of creditors in December 2009.  The significance of this exchange cannot be overstated.

> THE TRUSTEE: Well, I don't see this case going anywhere as it is, so, I mean, I – I've got to see that he's current on it if it's a DSO, but I don't think it's going to get that far anyway.  So just be advised that if we do get all the way to confirmation, he's going to have to show that he's current or establish that it's not support.
>
> Have you filed all the tax returns that you should have filed in the last four years?
>
> MR. WEDDINGTON: Yes, ma'am.
>
> THE TRUSTEE: All right.  Let's start off with the payment problem in this case.  You have not made a payment in this case, why not?
>
> MR. WEDDINGTON: I can make a payment.  The original plan [in the previous chapter 13 case], we didn't have any business and we had to liquidate all of our equipment.

---

[59]  Monthly plan payments of $4,500 in the first chapter 13 plan were reduced to $2,800 in the second chapter 13 plan.

Case 10-05236   Doc# 41   Filed 09/07/11   Page 19 of 30

THE TRUSTEE: And your last case was dismissed because you weren't making payments, so now you've failed to make a payment in this case, why is that – why is that excusable in your mind?

MR. WEDDINGTON: I wasn't aware that I was to make a payment yet.

THE TRUSTEE: Weren't you in a prior Chapter 13 case? Weren't you aware you had to make monthly payments in the prior case?

MR. WEDDINGTON: Yes.

* * *

THE TRUSTEE: Your payment was due on November 29th so you now are close to having two payments due. Are you going to be able to make two payments?

MR. WEDDINGTON: I can make one today for sure, yes.

* * *

THE TRUSTEE: And your next payment is – your first payment was due November 29th, your next payment is due by December 29th, and you – because of the prior history, you don't have any room to be missing payments.

MR. WEDDINGTON: Yes, ma'am.

* * *

THE TRUSTEE: . . . Another major problem is I don't have claims yet, but it takes at least $2,950 with the plan provisions as proposed. So not only is the failure to make the payments compound - - it's compounded by the fact that you're not making enough of the planned payment.

* * *

THE TRUSTEE: All right. *Mr. Weddington, I have very low hopes for this case. I'll be filing objections because the biggest problem is your plan is not feasible. I'm not sure it's filed in good faith since you did not make a payment in that case or in this case.*

*I haven't seen any business records, I have no clue how you think you're going to make a payment of that size, especially since you've not been able to provide either tax returns or business records, either in the first case or yet in this case. So*

-20-

*I think it's completely unrealistic for you to have refiled again, basically doing the same thing you have done in the prior case other than surrender a few pieces of collateral.* [Emphasis added.].

I'm sorry to be so harsh with you today, but you need get the message that if you are really sincere about proceeding in Chapter 13 bankruptcy, then the first thing you need to do is make your plan payments.[60]

What was Weddington's response? Silence. Did Weddington attempt to allay the trustee's concerns regarding the confirmability of his plan? No. Did Weddington attempt to explain how he could afford to make a $2,950 plan payment? No. Did Weddington attempt to explain that he had obtained new, full-time employment since his first case had been dismissed? No. Did Weddington attempt to explain what had changed since the first case? No. Did Weddington attempt to explain why this plan was realistic? No. Did Weddington attempt to explain why his plan was filed in good faith? No. Any one of those explanations would have brought to light Weddington's employment and income from Spurrier.[61] At this point, Weddington's omission of his employment turned into concealment. Weddington offered no plausible reason for not coming forward with the information when it was apparent that the chapter 13 trustee was searching for information about how he could execute his chapter 13 plan.

Weddington knowingly, and with reckless indifference to the truth, made a false oath concerning the accuracy of his bankruptcy schedules and the omission of his employment and income from Spurrier. His should therefore be denied a discharge under § 727(a)(4)(A). Because the Trustee prevails on the false oath count, the remaining § 727(a) denial of discharge claims

---

[60] Ex. 10, pp. 4-6, 8, 10-11.

[61] Had the trustee known of the Spurrier employment and given the debtor's previous failure to make plan payments, an employer income withholding order likely would have been entered to ensure the trustee's receipt of plan payments.

advanced by the Trustee need not be addressed.[62]

*Expansion of the Estate, § 348(f)(2)*

The Trustee asserts that Weddington's chapter 7 estate should be "expanded" as a result of his bad faith. Section 348(f)(1) provides that when a debtor converts a chapter 13 case to one under chapter 7, the property of the estate consists of the property of the estate that existed as of the date of the filing of the chapter 13 petition that remains in the possession of or is under the control of the debtor on the date of conversion. If, however, the debtor converts to chapter 7 "in bad faith," the property of the estate "shall consist of the property of the estate as of the date of conversion."[63] In other words, the Trustee may recover any property that the debtor had an interest in at conversion, not just that which he owned on the petition date and still possessed or controlled at conversion. Absent bad faith, pre-conversion property acquired by the debtor during the chapter 13 is not included in the chapter 7 estate.[64] The debtor may be paid undistributed wages in the form of plan payments that remain in the hands of the chapter 13 trustee upon conversion. By contrast, if the debtor converts in bad faith, any rights he may have to receive or recover property he acquired post-petition become property of the chapter 7 estate whether the property is in his possession or not. That property is subject to the Trustee's administration. In this case, unless the debtor's estate is expanded, the Trustee will have no ability to pursue the 2009 tax refunds or the chapter 13 refunds because the debtor spent them before conversion.

---

[62] *Garland, supra* at 818 (Proof of any one of the § 727 exceptions is a sufficient basis upon which to deny discharge.).

[63] Section 348(f)(2).

[64] *See* Alan N. Resnick and Henry J. Sommer, 3 COLLIER ON BANKRUPTCY ¶ 348.07 (16th Ed. 2011).

What few courts have applied this sub-section have looked to whether the debtor has engaged in some sort of wrong-doing by converting.[65] Was the conversion motivated by the debtor's inability to make chapter 13 payments? Did the conversion create a windfall for the debtor?

During the October chapter 13 case, the debtor made the equivalent of four $2,800 plan payments, though he did not pay on time and had not even made a single payment by the time of his chapter 13 § 341 meeting in December of 2009. While his chapter 13 trustee never knew of it, Weddington's employment at Spurrier gave him the ability to make his plan payments. Unfortunately, neither the Trustee nor the debtor's counsel asked the debtor why he decided to convert or its timing. Yet he gained a substantial windfall when he obtained a sizeable tax refund and two chapter 13 refunds while living on undisclosed wages. He spent some of that windfall on a vacation and his internet pursuits. He gained the ability to keep his 2009 refunds out of the chapter 7 estate by virtue of § 348(f)(1)(A).

The combination of circumstances present in this case suggest bad faith.[66] While

_____

[65] *See* Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4TH EDITION, § 316.2, Sec. Rev. June 17, 2004, www.Ch13online.com. *See also In re Mullican*, 417 B.R. 408 (E.D. Tex., 2009)(bad faith is "not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.").

[66] One of the first and oft-cited bad faith cases is *In re Siegfried,* 219 B.R. 581, 585 (Bankr. D. Colo. 1998) (concluding that the bad faith inquiry requires the bankruptcy court "to determine if there has been an unfair manipulation of the bankruptcy system to the substantial detriment or disadvantage of creditors."). In that case, the bankruptcy court borrowed in part the chapter 13 standards applicable to lack of good faith under § 1325(a)(3) in determining and applying the "bad faith" standard in § 348(f)(2). *Id.* In this Circuit, the § 1325(a)(3) lack of good faith standard is determined on a case-by-case basis and the totality of the circumstances based upon consideration of the *Flygare* factors. *Flygare v. Boulden,* 709 F.2d 1344 (10th Cir. 1983); *In re Rasmussen,* 888 F.2d 703, 704 (10th Cir.1989). Three of the *Flygare* factors are prevalent in the instant case and weigh heavily against debtor: the frequency with which the debtor has sought bankruptcy relief, the inaccuracy of his papers regarding his work, and the debtor's motivation

Weddington claimed that he wanted to save his home in chapter 13, he spent lots of money on internet companionship and in the Ukraine instead of funding his mortgage. Indeed, he began spending money on Anastasia International shortly after being directed to bring his plan payments current on pain of dismissal of the case. His conversion came only after he received the tax refunds and his first chapter 13 refund, over $11,000. The Trustee proved that the debtor converted in bad faith and the chapter 7 estate should be expanded to include all of Weddington's non-exempt property as of May 3, 2010, as provided for in § 348(f)(2).

*The Debtor's Principal Trade, § 522(b) and Tools Exemption, Kan. Stat. Ann. § 60-2304(e)*

Weddington claimed fiberglass hunting stands and feeders as exempt tools of his trade pursuant to the Kansas exemption statute, KAN. STAT. ANN. § 60-2304(e) (2005).[67] Trustee Davis objected that Weddington's employment with Spurrier is his principal trade and, therefore, the Trustee should be permitted to recover and sell the hunting assets.[68] At issue here is what trade or business was Weddington's principal occupation on the petition date, October 29, 2009. The burden falls to the Trustee to show why the debtor is not entitled to the claimed exemption.[69]

On the petition date, Weddington had earned only a few thousand dollars of gross income from his brief employment with Spurrier. Weddington testified that the $55,300 of gross income during 2009 to the date of filing and as reported on his Statement of Financial Affairs consisted of income from Spurrier, the hunting business, and Water Designs. According to his 2009 tax return,

and sincerity in seeking chapter 13 relief.

[67] Ex. 6, Schedule C.

[68] Case No. 09-13588, Dkt. 84.

[69] Fed. R. Bankr. P. 4003(c).

-24-

the debtor earned gross wages of $16,825 from the Spurrier job he held for approximately one-fourth of the tax year and had gross revenues from his 10-Gauge Outfitters business of $20,550 for the entire tax year. He netted ($1,057) from that business in 2009. He works full time for Spurrier except for the four weeks a year that he spends as an outfitter and hunt guide. There is no other evidence of Weddington's earnings for 2010 beyond whatever can be deduced from the bank statements and pay stubs. As noted previously, debtor would earn approximately $68,000 if employed a full year at Spurrier.

In *Seel v. Wittman*, District Judge Rogers relied on ancient Kansas precedent to hold that a Kansas debtor who carries on more than one trade or profession may only exempt the tools of the trade incident to the business in which he is primarily engaged.[70] In the 1881 case, *Jenkins v. McNall*, the judgment debtor worked as a newspaper editor, a job-printer, and a loan officer.[71] On the record before it, the Supreme Court concluded that the debtor relied only in part on the printing business for his support and that job-printing was therefore not his principal business. The court denied the debtor's exemption of his printing press. Four years later, in *Bliss v. Vedder*, the court dealt with a similar case. In *Bliss*, the debtor was a newspaper publisher, job-printer, and loan officer. But there the record suggested that the printing press was a critical tool of the trade of publishing and that the debtor used the printing press himself in that pursuit. Most important, the court concluded that "the publishing of said newspaper was his *main, chief, and principal business*, from which he derived his principal support; that all the property so levied on was then used in and

---

[70] 173 B.R. 734, 736 (D. Kan. 1994).

[71] 27 Kan. 532 (1881).

about the publishing of said newspaper . . . ."[72]  On that basis, the debtor was allowed to exempt his

press.  In *Miller v. Weeks*, the Supreme Court again addressed this issue, concluding that a tinsmith

who also operated a hardware store could exempt his tinning tools because, after he assigned the

hardware store for the benefit of his creditors, tinning was his primary occupation.[73]

Whether or not these precedents reflect the economic realities of the 21st Century, they have

remained undisturbed by the Kansas appellate courts and the Legislature since 1891.  The language

of the statute they interpret is nearly identical to that in force today.  The Kansas Supreme Court's

interpretation of the Kansas statutes requires that a Kansas debtor may only exempt the tools of his

primary or principal trade.[74]

In addition to *Seel*, bankruptcy courts sitting in Kansas have applied other tests to determine

what a debtor's principal trade is for exemption purposes.  In *In re Kieffer*, one court compared the

debtor's gross nursing wages with the gross income from the farm she operated with her husband.[75]

In making the comparison, that court opted not to compare net incomes because a farmer may take

certain business deductions that are not available to a wage earner.[76] At the same time, the *Kieffer*

court declined to rely solely on percentages of time spent at the debtor's respective labors and,

---

[72]  34 Kan. 57, 60 (1885).

[73]  46 Kan. 307 (1891).

[74]  *But see In re Thompson*, 311 B.R. 822 (Bankr. D. Kan. 2004) (Liberal construction of Kan. Stat. Ann. § 60-2304(e) allows debtor to retain as exempt the tools of more than one trade). Because of the binding nature of Kansas precedent on this point, this Court must respectfully disagree with the holding in *Thompson*.

[75]  279 B.R. 290, 294 (Bankr. D. Kan. 2002).

[76]  279 B.R. 290, 294 (Bankr. D. Kan. 2002).

-26-

considering both her time commitment and the comparative gross incomes of her job and farm, concluded that the debtor could claim a tool of the trade exemption as a farmer.

While the creditor in *Kieffer* focused exclusively on a comparison of income figures, the bankruptcy court attempted to determine what percentage of the farming income was attributable to debtor.[77]  Similarly, *Seel* focused upon the gross and net income received by the debtor from his respective pursuits.  Without addressing which income figure, gross or net, was the appropriate measure, *Seel* held that in the case of self-employment income, non cash expenses like depreciation cannot be considered in the calculation of net income.  Under the facts in *Seel*, the debtor's vending business provided the principal support whether gross income or net income was considered.[78]

Other courts have focused more on what activity or occupation the debtor principally engages in.[79]  Most of these cases arise in the context of a farmer or farmer-wife who holds an off-farm job to supplement the couple's farm income and seeks to exempt farm machinery or equipment as tools of the trade.  In *Oetinger,* the bankruptcy court examined the time or hours devoted by the farm-wife to her respective occupations to determine from which occupation she derived her principal

---

[77]  *Id.* at 295. (Noting that Paula's contribution of actual labor or percentage of time spent in the farming operation is not the sole criterion for determining the amount of income that should be attributable to her but finding that Paula's farm-related activities coupled with her actual farm labor contributed 50 per cent.)

[78]  173 B.R. at 737 (excluding non-cash depreciation costs from the determination of debtor's principal support).  *See also In re Kieffer*, 279 Kan. 290 (Bankr. D. Kan. 2002) (In determining whether wife of farmer may exempt farm implements as tool of her trade, the court concluded that her income from off-farm employment was less than her share of the farm income).

[79]  *See In re Lampe,* 278 B.R. 205, 209-11 (10th Cir. BAP 2002) (Despite full-time, off-farm jobs held by debtors, farming was their primary occupation where they farmed in the months preceding their bankruptcy filing, planted a crop prior to filing, and continued to farm post-petition.), *aff'd* 331 F.3d 750 (10th Cir. 2003).

-27-

support.[80]  Likewise, the bankruptcy court in *Zink* found that debtor-wife could exempt a feed truck as a tool of trade where she spent more time farming than as a self-employed hairdresser.[81]

Courts considering this question may compare the gross incomes from the debtor's various trade pursuits or consider the amount of time and effort the debtor expends in each, or both.  Here, as in *Kieffer,* we compare Weddington's self-employment income from his hunting and water design businesses to his wage earner income from his job at Spurrier.  The only evidence is the 2009 tax return, the 2009 Spurrier earning statements, and Weddington's testimony.  The tax return does not identify Weddington's occupation on the signature page.  According to his 2009 tax return, Weddington received $20,550 gross revenue from guiding for the year and $16,825 in gross wages from Spurrier, while he held the Spurrier job only one-fourth of the tax year.  And while the tax return purports to reflect the business loss of the guide business, Weddington testified that Tax Schedule C included both the water design business and the guide business combined.[82]  He did not however, testify to how that gross income or business loss was allocated between the two businesses. While the businesses had a net loss of about <$1,000> in 2009, Schedule C of his 2009 tax return shows no deductions for non-cash expenses like depreciation.  If Weddington's gross income from

---

[80]  *In re Oetinger,* 49, B.R. 41, 42-43 (Bankr. D. Kan. 1985) (wife's part-time, off-farm job at insurance agency for 20 hours per week left many hours before and after work and on weekends for her labor on the farm; wife operated farm equipment, hauled grain, and fed hogs on the farm).

[81]  *In re Zink,* 177 B.R. 713 (Bankr. D. Kan. 1995) (Debtor-wife worked one day a week in her beauty salon prior to bankruptcy and two days a week since her bankruptcy while active in the farming operation on a daily basis.).

[82]  Weddington also testified at trial that the water design business had "dried up" by October 2009.  But in the chapter 7 § 341 meeting in August 2010, he testified that he was still engaged in the water design contracting business. Ex. 11, p. 3.

-28-

the Spurrier job were annualized to provide a more accurate comparison of Weddington's two occupations for a full year, his Spurrier pay would provide the principal support, not the guide business.[83]

Weddington also devotes the bulk of his time and effort to his work at Spurrier. He works a 40 hour work week there and Spurrier is his full-time employment. He has been continuously employed at Spurrier since September 15, 2009 through the time of trial nearly two years later. In contrast, Weddington's guide business is part-time and seasonal, being most time-consuming when the hunting seasons are in effect. Weddington did not estimate the number of hours a week or days per year he devotes to his guide business, but he did state that he takes vacation from Spurrier to guide deer hunts. This suggests that the vast majority of his time is spent at Spurrier, not in the field guiding.

By either the gross income or time measure, Weddington's full time job with Spurrier is his primary occupation from which he derives his principal support. Guiding hunts is not. Therefore, the hunting equipment he seeks to exempt cannot be tools of his trade.[84] The Trustee's objection to Weddington's claimed exemption in the hunting assets is therefore SUSTAINED.

<u>Conclusion</u>

The Trustee demonstrated that the debtor knowingly and fraudulently made a series of false

---

[83]  The Spurrier job would also be the principal occupation if net income was the measuring stick, although this is not an even comparison where one of the pursuits is a wage-earning pursuit and one is a business. In any event, it is apparent that Weddington's wage earner job contributes a significant portion of his means. *Cf. In re Kobs,* 163 B.R. 368, 373-74 (Bankr. D. Kan. 1994) (farm wife's part-time off-farm job as a librarian contributed only 10% of the couple's total 1990 gross income and means of living).

[84]  *Zink, supra* at 715 (Tools of trade exemption is applicable only to debtor's primary occupation.).

Case 10-05236    Doc# 41    Filed 09/07/11    Page 29 of 30

oaths when he failed to disclose his employment in his chapter 13 papers and at his chapter 13 and chapter 7 § 341 meetings. That omission was material and the false oath was made with reckless disregard for the truth. Judgment shall therefore be entered on the adversary complaint for the Trustee denying the debtor a chapter 7 discharge. A separate Judgment on Decision shall issue this day.

The Trustee's motion to expand the estate for bad faith conversion under § 348(f)(2) is GRANTED.

Based upon the finding that the debtor's principal occupation is his work at Spurrier, the Trustee's objection to the debtor's exemption of his outfitting equipment as a tool of his trade under KAN. STAT. ANN. § 60-2304(e) is SUSTAINED. This Order shall constitute the final order on the Trustee's motion to expand the estate and his objection to exemption.

# # #

-30-